UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEVIN SCHMUDE,

        Plaintiff,

v.                                                                                 Case No. 07-C-457

TRICAM INDUSTRIES, INC., et al.,

        Defendants.

## DECISION AND ORDER

On March 26, 2008, following a two-and-a-half-day trial, a jury returned a verdict in the above product liability action awarding Plaintiff Kevin Schmude $677,317.94 for injuries he sustained when he fell from a newly purchased eight-foot stepladder while installing radio frequency shielding in a hospital room intended to house a magnetic imaging resonance (MRI) machine. The jury found that the ladder, which was manufactured by Defendant Tricam Industries, Inc., was unreasonably dangerous because of a manufacturing defect and failed when Schmude was standing on it to check for a short in the shielding installed on the ceiling of the room. Tricam has now moved for a new trial and/or judgment as a matter of law following a jury verdict in favor of the plaintiff. Fed. R. Civ. P. 59. In their motion, the defendants cite eight instances in which they believe this court erred during and prior to the trial. I will address each in turn. Ultimately, I conclude that the motion should be denied.

**1. Johnson's Testimony**

Tricam's first several arguments take issue with the testimony and demonstration of plaintiff's expert, Stanley Johnson. Johnson, an industrial designer, testified that the ladder Schmude was using at the time of the accident was unreasonably dangerous because of a manufacturing defect. The ladder, having a typical stepladder ladder design, was comprised of a front ladder portion consisting of two rails with steps in between, fastened at the top to a hard plastic cap. Two rear rails, or legs, that were also fastened to the cap and connected by spreader bars to the front rails, permitted the ladder to stand upright when it was in use. (Ex. 1.) The defect occurred during assembly when the right rear leg, or rail, was being fastened to the top cap of the ladder. The design called for a rivet to be inserted through preexisting holes in the cap, the top of the rail and a backer plate. A machine would then stamp, or "peen," the hollow, tubular end of the rivet, thereby causing the edges to mushroom outward and lock the rivet in place. (Ex. 3.) When the ladder Schmude was using at the time of the accident was assembled, however, the preexisting holes in the top cap, the rear right rail and the backing plate were not properly aligned. As a result of the misalignment, the rivet was forced through part of the cap adjacent to the preformed hole and did not cleanly pass through the assembly. A portion of the hollow tubular end became embedded in the backplate when it was peened. (Ex. 5a-5d.)

The existence of this defect was not disputed. Nor was it disputed that the rivet failed and the rear leg became dislodged from under the cap during the accident. A witness who came upon the scene immediately after the accident testified that he saw the ladder on its side next to Schmude and the rear leg was detached at the site of the defect. The main part of the rivet was found on the

2

floor. In his testimony, Johnson explained how the rivet was intended to fasten the leg to the cap of the ladder but failed because it was improperly peened.

Tricam argued that the failure of the rivet was not enough to explain the accident because the cap would have held the leg in place and prevented the ladder from collapsing under Schmude even if the rivet had failed while he was standing on it. Tricam's expert demonstrated the point in a video presentation by inserting a screw driver into the holes of the cap and leg in place of the rivet and then rapidly pulling it out to simulate the failure of the rivet. The ladder dropped slightly, but the leg remained lodged under the cap and the ladder did not collapse. (Ex. 1029.) Based upon this evidence, Tricam argued Schmude's account of the accident could not be accurate.

Of course, unlike Schmude, the person standing on the ladder in Tricam's demonstration knew the screw driver holding the leg in place was about to be removed and was holding onto the ladder with two hands. Schmude had no reason to expect even a slight drop and was working on the ceiling with his hands over his head. Schmude also weighed more than 350 pounds. In any event, Johnson thought the manufacturing defect significantly reduced the strength of the rivet so that it may have failed when the ladder was first stood on its legs or even earlier. Johnson then attempted to show the jury how–in his view–the leg of the ladder could have easily become dislodged once the defective rivet failed. In his demonstration, Johnson "jerked" the ladder towards him, which resulted in the ladder leg becoming dislodged. The leg then remained outside the top cap of the ladder, which resulted in the ladder's instability.

Tricam objected to Johnson's testimony and his demonstration on several bases. It first argued that Johnson's proposed testimony failed to meet the requirements of *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579 (1993). Tricam further objected that Johnson's testimony

3

changed prior to the trial and that his testimony differed from the explanation he had given in his pretrial report. Tricam argues that the court erred in permitting Johnson's testimony and abused its discretion in permitting him to offer opinions not previously disclosed in his Rule 26(a)(2) report. The court further abused its discretion, Tricam argues, in allowing Johnson to perform an in-court "test" at trial that was not previously disclosed.

A central problem with Tricam's argument is that it ignores–or refuses to acknowledge–that this case is based upon a disarmingly simple theory: that the plaintiff was injured when the ladder on which he was standing failed due to a manufacturing defect in the rivet that fastened one of the rear legs of the ladder to the cap. Although Schmude was the only witness to the fall, it is undisputed that his boss who came upon the scene immediately after the fall observed him on the floor with the ladder lying next to him, the leg having separated at the location of the defective rivet.

As noted, Tricam did not dispute the existence of the manufacturing defect in the rivet that fastened the leg to the cap; nor did it deny that the rivet failed. Instead, Tricam sought to convince the jury that the accident resulted not from the improperly peened rivet that failed to properly fasten the rear leg of the ladder to the cap, but from Schmude's own failure to use due care for his own safety, a defense Tricam was granted leave to assert over plaintiff's objection less than a month before trial commenced. Tricam claimed that the accident happened when Schmude climbed too high on the eight-foot ladder in a room with a ten-foot ceiling and lost his balance. To explain how the rivet came out and the rear leg of the ladder became dislodged from the cap, Tricam speculated that Schmude had fallen on and struck the ladder at the precise location, i.e., approximately four inches below the cap, where its own testing had shown that a force of 380 pounds would cause the failure of a rivet on a ladder on which it attempted to create a similar defect. (Ex. 1001.) Despite

4

Tricam's concession that it was unable to reproduce the same manufacturing defect in its test ladder that appeared on the accident ladder and had not forced the rivet through the misaligned cap as had occurred on the accident ladder, and over plaintiff's strong objection that its "tests" were misleading, Tricam was allowed present its own theory to the jury. Now that the jury has, not surprisingly, rejected its theory, Tricam claims that the court erred in allowing plaintiff to offer his own simple and straightforward explanation on the ground that it was not rigorously tested, peer reviewed, and fully disclosed before trial. In this court's view, however, neither *Daubert*, nor Rule 26, were intended to provide the kind of shield that Tricam has attempted to erect upon them. I will address the *Daubert* issue first.

**a.** *Daubert*

Under the *Daubert* framework, the court must determine whether the proffered expert testimony is both relevant and reliable. *Ervin v. Johnson & Johnson, Inc.* 492 F.3d 901, 904 (7th Cir. 2007). This is a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. In determining reliability, *Daubert* also sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. Here, I concluded that Johnson was qualified by knowledge, skill, training, education and experience to testify as an expert. Johnson has a degree in product design from the Illinois Institute of Technology and had studied mechanical

5

engineering at the University of Wisconsin at Madison. He has owned his own design company for over thirty years and has done product design work for such companies as Harley-Davidson, Sears, and Emerson Electric. He holds over sixteen patents and has designed approximately forty different products. Johnson testified that he had previous experience with rivets and explained their purpose and how they worked as fasteners. Though rivets are not complex devices, I concluded that Johnson's testimony about the manufacturing process and how rivets were peened would assist the jury in understanding the evidence relating to the defect in the manufacture of the ladder and how it may have caused the accident that was the subject of the case.

To be sure, Johnson's opinion as to how the ladder failed was not subjected to scientific testing or submitted for peer review or publication. But the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael* noted that whether *Daubert*'s specific factors are reasonable measures of reliability in a particular case is a matter the trial judge has "considerable leeway" to determine. 526 U.S. 137, 152 (1999). The goal is to ensure that an expert employs procedures and analysis in a way that is similar to how an expert in the given field would operate outside of court. Here, the expert simply explained how a properly peened rivet was intended to fasten the rear leg of the ladder to the cap and described how in his opinion the misalignment of the ladder assembly in the manufacturing process caused the defect that resulted in the failure of the product.

The defect, by its very nature, did not lend itself to the kind of empirical testing *Daubert* envisioned for opinions that are based on cutting edge science. The issue was not, as Tricam suggested in its motion in limine, the strength of the metal used to manufacture the rivet. The plaintiff's theory was that the rivet failed because it was misaligned and had not fully passed through the assembly when it was struck. As a result, only a portion of the tubular part of the rivet

6

that was intended to expand or mushroom outward on the inward side of the backing plate to hold the leg in place went through. Once it failed, there was nothing to test. Not even Tricam, which had access to the machinery at its plant in China that produced the defect, was able to duplicate the malfunction that caused it. Other than carefully examining the failed rivet, including the portion embedded in the backing plate, there seemed little else for an expert to do.

As to the second question – how the leg, once the rivet failed, may have become dislodged from under the cap – I am satisfied that Johnson's presentation was not so much a matter of expert testimony as simply displaying for the jury the qualities of an item of physical evidence. Johnson simply demonstrated the ladder's instability once the rivet fastening the rear leg to the cap failed. No one knows precisely how the rear leg became dislodged and the ladder collapsed after the rivet fastening the leg to the cap failed, but Johnson was able to show one way in which the leg might have become dislodged. At the jury's request, the ladder was sent to the jury room, and jurors may have found other ways in which the unattached leg could have become dislodged from the cap. Tricam, on the other hand, was able to demonstrate why, in its view, the failed rivet by itself could not have caused the accident. Based on its own consideration of the evidence, the jury rejected Tricam's explanation and found that the defect caused the accident. The evidence is more than sufficient to support its finding.

In sum, there is no singular well-accepted, standardized way for an engineer with manufacturing experience to reconstruct an accident involving a ladder with a specific and unique defect that could not be duplicated, and I am satisfied that Johnson's method was as sound as can be expected; in fact it is difficult to imagine how else the plaintiff could have gone about demonstrating his theory to the jury. Scientific precision is not possible in a case of this nature, and

7

when the case involves recreating a relatively simple accident, the court's gatekeeping role is limited by the simple fact that a jury is more than capable of distinguishing between plausible and implausible explanations and weighing the expert's presentation against the other evidence. In other words, in my view, this was a case in which the adversarial process was fully able to explain alternatives to the jury without the possibility that the jury would be swayed by unscientific principles or improper testimony. The theory that a stepladder may collapse if the rivet fastening one of the legs to the cap fails is not "rocket science."

### b. Rule 26(a)(2)(B) violation and exclusion under Rule 37(c)(1)

Prior to trial, Tricam moved in limine to bar Johnson from varying his opinion as to the defect and proximate cause from what he had written in his Rule 26(a)(2)(B) report. Tricam claimed that in his report, Johnson said that the rivet was not peened and simply fell out, whereas in fact, and as he was allowed to testify at trial, the rivet was improperly peened and the improperly peened portion apparently sheered off. Tricam contends it was an abuse of discretion for the court to allow Johnson to vary his testimony from his report and offer a different theory of how the ladder was defective. It contends that pursuant to Rule 37(c)(1), his testimony should have been excluded.

Rule 26 requires an expert to include in his report "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). The purposes of the rule, like the purposes of the federal rules governing discovery in general, are "to avoid surprise and the possible miscarriage of justice, to disclose fully the nature and scope of the controversy, to narrow, simplify, and frame the issues involved, and to enable a party to obtain the information needed to prepare for trial." Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* § 2001 at 44-45 (West 1994). To ensure compliance with these discovery

8

requirements, Rule 37 provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1); *David v. Caterpiller, Inc.*, 324 F.3d 851, 856-57 (7th Cir. 2003). "[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). Yet, because exclusion can be fatal to a party's case, the court should carefully consider the issue before ordering such a drastic sanction. In deciding whether exclusion is required, the following factors are relevant: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. *David*, 324 F.3d at 857.

As I previously stated during the trial in this matter, Tricam's reading of the federal rules as requiring exclusion of any opinion that an expert offers in his testimony that was not disclosed in his Rule 26(a)(2) report is inconsistent with the general purpose of the rules "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. To disclose everything he intends to say in his testimony, an expert would need a complete list of the questions he will be asked and it would require a report as long as a transcript. Rule 26(a)(2)(B) requires that the expert set forth "the substance of the direct examination." *Jenkins v. Bartlett*, 487 F.3d 482, 487 (7th Cir. 2007) (quoting Fed. R. Civ. P. 26 advisory committee's note). By this standard, Johnson's report was sufficient.

9

Johnson explained in his report that his examination of the ladder, which was also made available to Tricam, revealed that there was a manufacturing defect in the right rear rail rivet assembly. He described one photograph attached to his report that depicted the location on the hard plastic cap where the rivet, because of the misalignment, had been forced through the material, thereby enlarging the preformed hole. Another photograph depicted the assembly with a properly peened rivet. Johnson noted that "even the most casual quality control inspection would recognize that the Schmude ladder rivet was not properly peened and was jammed with the black top material where the rivet should have been clearly visible." (Ex. 11 at 3.) Johnson concluded in his report that "[t]he collapse of the ladder resulting in Schmude's injuries was due to the failure of a critical rivet designed to singularly fasten one rail of the ladder." (*Id.*) While it also appears that at the time he wrote his report, Johnson may have thought that the rivet had not been peened at all and had simply fallen out intact, it was clear from the portion of the rivet embedded onto the backing plate that the misaligned rivet had been struck, albeit improperly, by the peening machine, resulting in a defective fastener that later failed before or immediately after the ladder was first used.

That a portion of the rivet had broken off was not a surprise to Tricam. Indeed, as Tricam argued in its motion in limine to exclude Johnson's testimony, Tricam's own expert had testified that the rivet was severed a month before Johnson issued his report. (Dkt. 33 at 9.) Nor was the precise mechanism of failure of the rivet crucial to Johnson's opinion. His opinion was based on the fact that a critical fastener for a leg of the ladder failed as the result of a manufacturing defect. Whether it failed because it was not peened at all or because it was improperly peened was not significant to his opinion. What mattered was that a manufacturing defect caused the fastener to fail. Based upon these facts, I denied Tricam's motion to bar Johnson from testifying. I am

10

satisfied that this was the correct ruling. Johnson's report adequately disclosed the substance of his testimony. To the extent Johnson was confused or less than clear as to the precise mechanism of the rivet's failure, Tricam was not surprised or prejudiced in its defense. Moreover, when at one of the pretrial conferences, the court suggested the possibility of granting an adjournment to avoid any possible prejudice, Tricam had no interest. Nothing Tricam has offered in its post trial motion calls into question my previous ruling.

Tricam also contends that the court erred in allowing Johnson to demonstrate to the jury how, once the rivet failed, the leg could have become dislodged from the cap of the ladder, allowing it to collapse. This issue, too, was the subject of one of Tricam's pretrial motions in limine. Tricam moved to bar any in-court testing of the ladder by Johnson before the jury because it had not been disclosed as required under Rule 26(a)(2)(B). Although plaintiff's counsel stated he had no intention of having his expert perform in-court testing of the ladder, he stated he may want him to demonstrate the unstable quality of the ladder once the rivet failed. At the pretrial conference, the court instructed plaintiff's counsel to avoid any such in-court demonstration without first bringing it to the attention of the court and counsel for Tricam outside the presence of the jury so that the court could consider the demonstration and the arguments against it before ruling. Counsel followed the court's instruction and before calling Johnson to testify, had him show the court and counsel the manner in which he intended to demonstrate to the jury the instability of the ladder once the rivet failed and the leg was no longer fastened to the cap. The demonstration consisted of, as Tricam described it, "jerking" the ladder while setting it up, but in this court's view it was not done "violently," or beyond what one would expect in ordinary use. The leg became dislodged. Over Tricam's objections, I allowed Johnson to perform the same demonstration before the jury. As

11

noted above, I concluded that the demonstration was not a test in the sense that *Daubert* envisioned, but simply an example of one way in which the leg could have become dislodged from under the cap once the rivet failed. Allowing Johnson to demonstrate the unstable quality of the ladder in this way was not a violation of Rule 26. The demonstration was not an undisclosed test, but simply a reasonable response to Tricam's suggestion that the failure of the rivet could not have caused the accident. Nor was it prejudicial, especially in light of the fact that Tricam had the same opportunity to demonstrate the ladder's qualities, once the rivet was removed, as did the jury itself.

Tricam also claims, however, that Johnson's demonstration should not have been allowed because Schmude had not testified that he ever "jerked" the ladder before climbing it, and jerking the ladder was a precondition for Johnson's demonstration of how the rivet popped loose. Tricam notes that in *Fitzpatrick v. Louisville Ladder Co.,* 2001 WL 1568389 (D. Neb. 2001), the court directed a verdict in the ladder manufacturer's favor because there was no evidence the plaintiff had "racked" the ladder in question. The court defined racking as "a situation where a rear leg of the ladder is off the ground and the base of the ladder forms a parallelogram instead of a rectangle." *Id.* at *2. The plaintiff's expert opined that the ladder was prone to excessive racking and that the plaintiff (who didn't remember anything about his fall) had inadvertently transferred too much of his weight while the ladder racked. Without any evidence that the ladder had actually "racked," however, the court was unwilling to allow a jury to rely on the expert's speculative theory.

The racking theory in *Fitzpatrick* was a crucial aspect of the expert's opinion explaining the cause of the ladder failure. In fact, the racking of the ladder was the actual defect alleged. Here, however, the plaintiff's expert was merely claiming that jerking the ladder in question into position had the effect of exposing a *different* defect that was latent in the ladder itself. In that sense, the

12

expert's testimony did not so heavily rely on the happening of an event for which there was no evidence. In addition, "jerking" a ladder to get it into position is a fairly commonplace event–far from the unusual racking theory proposed in *Fitzpatrick*. Accordingly, the fact that there was no particular evidence about Schmude jerking the ladder is not fatal to his theory explaining how the accident occurred.

**2. Plaintiff's Felony Conviction**

Tricam next argues that the court erred by "sanitizing" the plaintiff's prior conviction. Schmude had been convicted in federal court of the crime of engaging in the business of dealing in firearms without a federal license by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(4) and sentenced to eighty-eight months in prison in July of 1995. The plaintiff had moved in limine to exclude evidence of the felony altogether, and I initially granted his motion, subject to further consideration at trial. As the trial proceeded, I concluded that the prior conviction was relevant to the issue of Schmude's credibility, a key issue in the case. I also noted that the conviction was for what appeared to be an ongoing and intentional course of illegal conduct, as opposed to an impulsive and isolated act that would bear little relevance to a witness' honesty. Although the offense was more than ten years old at the time of trial, it was relatively recent if the time spent in prison was excluded. Concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, Fed. R. Evid. 403, the court ruled that under Fed. R. Evid. 609(a)(1), the jury could be told that Schmude had been convicted of the crime of selling firearms without a license. I also allowed the jury to hear that he had received a sentence of eighty-eight months, thereby indicating the seriousness of the offense. I excluded any reference

13

to the prior felony upon which the conviction was at least in part predicated, however, because it occurred outside of the ten-year period contemplated by Rule 609(b) and was not, in any event, particularly relevant. To inform the jury that he had been convicted of the gun charge because he was *already* a convicted felon would have circumvented the timeliness concerns expressed in Rule 609(c). Although Tricam contends I erred by sanitizing Schmude's record, Tricam never stated what the prior felony was, when it occurred, or gave the plaintiff notice of its intent to offer it. *See* Fed. R. Evid. 609(d). To inform the jury that Schmude had another felony conviction without saying what it was or when it occurred would simply have invited speculation by the jury and increased the risk of unfair prejudice. No doubt, had the trial turned out differently, plaintiff would be the one complaining that I allowed the conviction in at all. As it stands, I'm satisfied that the balance struck by the court was reasonable.

Finally, Tricam argues that the court compounded the error when it overruled counsel's objection when counsel for Schmude referred to the conviction in his rebuttal closing argument. Plaintiff's counsel stated to the jury in his rebuttal that Schmude had "paid his debt to society" and they should not "punish" him for his earlier crime. Counsel for Tricam objected on the ground that he had not mentioned Schmude's conviction in his closing. But counsel had attacked Schmude's credibility in his closing, and since the conviction bore on that issue, it was not beyond the scope of rebuttal for counsel to address it. Moreover, his argument on the issue was perfectly acceptable, since the evidence of the prior conviction was admissible only inasmuch as it was relevant to his credibility and employability. If Tricam has a different view of the purpose of admitting prior conviction evidence, it is an improper one.

14

**3. Testimony of Dr. Durette**

The defendants cite a panoply of reasons that the court erred in allowing certain testimony provided by Dr. Durette. Because Dr. Durette's testimony was taken before trial and presented by videotape, the court had the opportunity to address Tricam's objections before trial. The primary objection raised was that Dr. Durette's testimony, like Johnson's, varied from the opinions he had provided in his Rule 26 report. As I ruled before the trial, however, the defendants' notion of what must be disclosed is a severe one that fails to account for the reality that a Rule 26 report cannot possibly contain any and all statements and impressions possessed by an expert. For example, Tricam objects that Dr. Durette testified at his videotaped deposition that the entry in Dr. Fernandes' records referencing "chronic back pain" was not significant since there was no history of treatment of his back. Because Dr. Durette did not mention Dr. Fernandes in his Rule 26 report, Tricam claims he should not have been allowed to discuss Dr. Fernandes' records in his videotaped trial testimony. In Tricam's view, this was another violation of Rule 26(a)(2)(B)'s requirement that all opinions be stated in the expert's report. But giving further support for one's opinion when asked by an attorney at a deposition or trial is not the same as changing or adding to one's opinion. The fact that Dr. Durette, like any expert, expanded on his opinions and the basis for them when questioned during his trial testimony is not evidence of a Rule 26(a)(2) violation. I therefore overruled the objection.

It is true, however, that Dr. Durette did testify about the reasonableness and necessity of the medical expenses that Schmude had incurred for his injuries, even though that was not one of the subjects covered in his report. Tricam objected to this testimony and asked that it be stricken. But Tricam offered no argument that it was seriously challenging the amount that health care providers

15

had charged Schmude or his worker compensation carrier for their services. There was no suggestion that plaintiff had withheld the actual bills from Tricam and suddenly produced them at Dr. Durette's deposition. In other words, Tricam wanted the testimony excluded not because it was unfairly surprised and prejudiced by it, but simply because Dr. Durette did not include it in his report. When the court suggested that if it indeed wanted to challenge the reasonableness of the medical expenses Schmude had incurred for care and treatment of his injuries, the court would consider adjourning the trial to allow it to do so, Tricam was silent on the issue.

Even now, Tricam does not argue that the amount Schmude was charged for medical care and treatment was unreasonable or explain how it was harmed by Dr. Durette's failure to include his opinion on the issue in his report. It simply claims in conclusory fashion that it suffered prejudice as a result of the court's rulings. That isn't enough to warrant a new trial. Tricam's argument comes down to its insistence that Rule 37(c) be enforced strictly according to its terms. But by its terms, Rule 37(c)(1) does not require exclusion of evidence at trial where the failure to disclose it earlier was harmless. Here, I remain convinced that any failure on plaintiff's part to fully disclose Dr. Durette's opinion was harmless. It thus was not an abuse of discretion to allow the jury to consider Dr. Durette's opinion as to the necessity of the care and treatment Schmude received for his injuries and the reasonableness of charges he incurred.

Tricam also argues that it should have been able to probe Dr. Durette on his conclusion that Schumde's injuries were "3% cervical, 3% permanent disability thoracic, and 3% permanent disability lumbar." Dr. Durette had initially evaluated Schmude in connection with his worker's compensation claim, and the numerical percentages he assigned each region of the spine represent his assessment of the degree of permanent partial disability Schmude sustained in the accident for

16

purposes of determining the benefits he should receive under Wisconsin's worker's compensation law. They have no relation to the determination of damages in a personal injury action, however. The specific percentages were excluded because the court concluded they would mislead and confuse the jury. *Cf. Dull v. Continental Western Casualty Co.*, 1997 WL 768857, *1 (Wis. App. Dec. 16, 1997) (unpublished opinion). Indeed, Tricam initially objected to Dr. Durette's testimony for precisely this reason. (Dkt. # 41 at 4.) I agreed and ordered the percentages excised. Since Dr. Durette, as well as plaintiff's vocational expert, relied primarily upon a physical capacities evaluation that had actually measured Schmude's functional limitations, the jury had a solid foundation to assess his injury and any resulting loss of earning capacity without the numerical percentages. Tricam later changed its mind and insisted that the percentages be given. I remain convinced they would have been misleading and confusing. I thus find no error in this or any of the other issues Tricam has raised concerning Dr. Durette's testimony.

**4. Cross-Examination of and Testimony of Greg Wisniewski**

Greg Wisniewski was the plaintiff's vocational expert. Among the records he reviewed was an intake interview from the Wisconsin Division of Vocational Rehabilitation in which Schmude explained that he did not like people and preferred to work by himself. Schmude illustrated this attitude by stating something to the effect that if he saw a man bleeding to death in the gutter and a wounded animal, he would step over the man to help the animal. He also stated at one point that he fit in very well in prison and would not mind returning. Tricam wanted to introduce these statements, but I barred reference to them on the ground that they were exceedingly prejudicial in light of any limited probative value they may have had. Fed. R. Evid. 403. It was clear to the jury

17

that Schmude was neither a model citizen nor a paragon of virtue, and I allowed the jury to consider the majority of what Schmude said during his intake interview, including the fact that he had antisocial tendencies and did not like working around other people. The jury also knew he was a felon. The more colorful and shocking expression of the attitude Schmude conveyed was excluded because it was essentially cumulative and the danger of unfair prejudice was great. Careful consideration was given to the arguments on both sides of the issue, and I am satisfied that the ultimate ruling was reasonable.

      Tricam also argues it was error to allow Wisniewski to rely on a stipulation between Schmude and the worker's compensation carrier as to the amount of income he was receiving at the time of the accident in determining his past loss of earning capacity. Wisniewski testified that he had been unable to obtain records from Schmude's previous employer, and that the stipulated wage loss was the kind of evidence upon which vocational experts reasonably rely. The fact that the interest of the worker's compensation carrier was adverse to Schmude's suggests that such reliance is not unreasonable. Why would the carrier want to pay more than it was required to pay? In any event, it was offered as evidence and not presented to the jury as a stipulation of fact agreed upon by the parties. Tricam believes the evidence was speculative because Wisniewski had no evidence that plaintiff would have been retained by his employer or that the employer had sufficient business to keep him on. Even so, the figure was a piece of relevant evidence and the jury knew they were not bound by the stipulation (to which the defendants were not a party). The jury ultimately awarded a lower figure. Tricam was able to contest the amount plaintiff sought and present its own evidence, and there is no indication from the verdict that the jury was somehow confused about the limited role the contested evidence was to play.

18

**5. Cross-Examination of Plaintiff**

Finally, Tricam believes that the court erred in refusing it permission to recall and cross-examine Schmude regarding his post-injury complaints of pain. At the close of its case, Tricam asked permission to recall the plaintiff to the stand to testify about his claims that he suffered pain in his fingers, hands, back and ankle joints. Tricam wanted to explore these topics because they were not alleged to have been caused by the ladder accident and, in its view, could have impacted his claim for damages. But by that time, the jury had already heard from the parties' vocational and medical experts, who had rendered their opinions on what if any functional limitations Schmude had and how those limitations would affected his past and future earning capacity. Schmude had been interviewed and examined, his complete medical file had been examined by the doctors, and he had already testified about the accident and his condition. No one testified that any of the other maladies from which Schmude suffered caused functional limitations that affected his earning capacity. To question Schmude at that point about other unrelated ailments that no expert had tied to any functional limitation would simply have confused the jury or invited them to improperly speculate as to what if any impact such ailments might have had. If Tricam believed that Schmude suffered from additional, unrelated conditions that reduced his earning capacity, it should have offered such evidence through its medical and vocational expert. Because it had not done so, there was no reason to recall Schmude at the end of trial after it had already been given the opportunity to fully cross-examine him during the plaintiff's case-in-chief simply to address additional and unrelated sources of pain that even its own experts failed to link to any of his claims. Even now, Tricam points to no specific relevant evidence that it claims was excluded. I conclude that the court's ruling was not an abuse of discretion.

19

In sum, I conclude that Tricam has failed to point to any error warranting a new trial. I also conclude that the evidence was more than sufficient to support the jury's verdict. While the damages awarded were substantial, the jury carefully considered the arguments of counsel. Viewing the evidence in the light most favorable to the plaintiff, as I must at this stage, *see Wipf v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008), I conclude that the verdict should stand.

Accordingly, for the reasons given above, the motion for a new trial and judgment notwithstanding the verdict is **DENIED**.

**SO ORDERED** this   5th   day of May, 2008.

  s/ William C. Griesbach
William C. Griesbach
United States District Judge